Eugene LOBATO; Zack Bernal; Gabrielita Adeline Espinosa; Edward Espinosa; Pete E. Espinosa, Jr.; Corpus Gallegos, by and through his conservator Yvette Gallegos; Gloria Gallegos; Rupert Gallegos; Raymond Garcia; Charlie Jacquez, Jr.; Adolph J. Lobato; Bonifacio "Bonnie" Lobato, by and through his conservator Teresa Lobato; Carlos Lobato; Emilio Lobato, Jr.; Jose F. Lobato; Presesentacion J. Lobato; Gloria Maestas; Norman Maestas; Robert "Bobby" Maestas; Raymond J. Maestas; Eugene Martinez; Mark Martinez; Agatha Medina; Gilbert "Andres" Montoya; Shirley Romero Otero; Eppie Quintana; Lucille Samelko; Arnold Valdez; Ervin L. Vigil; Larry J. Vigil; Michael J. Vigil; Billy Alire; Robert Atencio; Frances D. Berggran–Buhrles; Jose Fred Carson; Elmer Manuel Espinosa; Margurito Espinosa; Moises Gallegos; Ruben Gallegos; Richard J. Garcia; Manuel Gardunio; Ruben Herrara; Jeffrey Jacquez; Adelmo Kaber; Crucito Maes; Daniel Martinez; David Martinez; Jesse Martinez; Leonardo Martinez; Rosendo Martinez; Solestiano Martinez; Alfonso Medina; Gilbert Medina; Leandardo Medina; Loyola Medina; Marvin Medina; Orry Medina; Raymond N. Medina; Rudy Montoya; Gurtrude C. Olivas; Eppy Wayne Quintana; Robert Romero; Shirley Romero; Anthony Sanchez; Bonnie Sanchez; Eugene Sanchez; Evan Sanchez; James Sanchez; Jose G. Sanchez; Rufino Sanchez; S.R. Sanchez; Vernon Sanchez; Ronald A. Sandoval; Elesam Santistevan; Daniel Segura; Floyd R. Solan; Carolyn Taylor; Sam Valdez; Martha Vialpondo; Joe P. Vigil; and Walter Vigil, Petitioners,

v.

Zachary TAYLOR, as executor of the Estate of Jack T. Taylor, Jr., deceased; The Taylor Family Partnership; J. Hoy Anderson; Marvin Lavern Stohs; Edythe Kelly Stohs; Charles W. Gelderman; William F. Phinney; Harlan A. Brown; Dena F. Fuhrmann; Jimmy C. Crook; Freeland D. Crumley; Joseph P. Campisi; Hugh R. Denton; Robert Paul Resteli; Eugene J. Kafka; Avis M. Anderson; Clifford R. Jenson; Don W. Jacobs; Raymond E. Gauthier; Francis P. Heston; and Howard G. Frailey, Respondents.

No. 00SC527.

Supreme Court of Colorado,
En Banc.

April 28, 2003.

As Modified on Denial of Rehearing
June 16, 2003.*

COATS does not participate.

---

* Justice KOURLIS and Justice RICE would grant the respondent's Petition for Rehearing; Justice

Brauer, Buescher, Goldhammer & Kelman, P.C., Jeffrey A. Goldstein, Littler Mendelson, P.C., William F. Schoeberlein, Robert Maes, David Martinez, Walters & Joyce, PC, Julia T. Waggener, Kelly, Haglund, Garnsey & Kahn, LLC, Norman D. Haglund, Don Hiller

& Galleher, PC, Watson Galleher, Elisabeth Arenales, Denver, Colorado, Attorneys for Petitioners.

Wolf & Slatkin, PC, Albert B. Wolf, Raymond P. Micklewright, Jonathan L. Madison, Denver, Colorado, Attorneys for Respondent.

Richard Garcia, Denver, Colorado, Peter L. Reich, Costa Mesa, California, Attorneys for Amicus Curiae Bi–National Human Rights Commission, International Indian Treaty Council, National Chicano Human Rights Council, Comision De Derechos Humanos De Seminario Permanente De Estudios Chicanos Y De Fronteras.

Federico Cheever, Gorsuch Kirgis, LLP, Loretta P. Martinez, Denver, Colorado, Attorneys for Amicus Curiae Colorado Hispanic Bar Association.

David J. Stephenson, Jr., Denver, Colorado, Attorney for Amicus Curiae Rocky Mountain Human Rights Law Group.

David H. Miller, Denver, Colorado, Attorney for Amicus Curiae American Civil Liberties Union Foundation of Colorado.

Henry J. Feldman, Denver, Colorado, Attorney for Amicus Curiae National Lawyers Guild, Colorado Chapter.

Chief Justice MULLARKEY delivered the Opinion of the Court.

Today's opinion is the third in a trilogy of decisions that we have issued construing some of the oldest property rights in the state. Involved are access rights to a large, mountainous tract of land in southern Costilla County, Colorado known as the Taylor Ranch.[1] These property rights trace their origins to the time before Colorado's statehood when southern Colorado was still a part of Mexico.

The Costilla County landowners, whose property rights are at issue, are the present-day descendants of 1850s frontier farming families who were recruited by Carlos Beaubien to move north from the Taos area in New Mexico and settle in what is now southern Colorado.

Beaubien acted from self interest: without settlers, he could not perfect his rights to the one million-acre Sangre de Cristo land grant because the Mexican government made settlement an express condition of the grant to Beaubien. To convince these families to move north, Beaubien granted the settlers access to the wooded, mountainous area to graze their animals, gather firewood, and harvest timber to build their homes and outbuildings. Without these property rights, subsistence farming on the valley floor would have been impossible.

At trial, many current residents of Costilla County testified that, for over one hundred years, the use of these rights was widespread by the families residing in the region. These residents testified that it was general knowledge in their communities that the Taylor Ranch could be used to graze their animals, gather firewood, and collect timber. According to trial testimony, the mountainous tract purchased by Taylor had been known simply as "la merced," roughly translated from Spanish to mean the gift or grant.

Our prior decisions have recited the history of the landowners' property rights up to the present day in detail. To summarize the roots of today's conflict, Jack Taylor purchased the Taylor Ranch in 1960. After purchase, he fenced off the property, patrolled the area with armed guards, and instituted a Torrens Title action in federal court in order to extinguish the landowners' property rights. His lawsuit gave personal notice to a small fraction of the predominantly Spanish-speaking, Costilla County landowners. The great majority of the landowners received notice only by publication. Taylor subsequently was successful in extinguishing the landowners' property rights.

In our first decision, *Rael v. Taylor*, 876 P.2d 1210 (Colo.1994), we determined that due process required that Taylor exercise reasonable diligence in the Torrens action to identify and personally serve all reasonably ascertainable persons with an interest in his property. We remanded the case for devel-

---

1. As referenced in our decision in *Lobato v. Taylor*, 2002 WL 1360432 *1, *2, 71 P.3d 938, 942– 944 (Colo. June 24, 2002), the Taylor Ranch includes those lands known as the Salazar estate, purchased by Jack Taylor in 1973. As such, our decision in the present case also applies to the Salazar estate.

opment of the facts, concluding that the appellate record was inadequate to permit us to determine whether Taylor had met the due process standard. *Id.* at 1228.

After the trial court developed the record on remand, the case was appealed for the second time. In our second decision, we held that the landowners have the same property rights as the original settlers to reasonably access the Taylor property for grazing animals, gathering firewood, and harvesting timber. *Lobato v. Taylor,* 2002 WL 1360432 *1, 71 P.3d 938, 942–943 (Colo. June 24, 2002) (*"Lobato I"*). As we explained in *Lobato I,* the rights Beaubien granted to the settlers were profits à prendre or, in more modern parlance, easements appurtenant to the land owned or occupied by the original settlers. *See* Restatement (Third) of Prop.: Servitudes § 5.2 (2000).

In this third opinion we resolve several remaining issues: (1) which present-day landowners may claim access rights to the Taylor Ranch; (2) whether Taylor met the due process requirements outlined in our first opinion when he gave notice to the landowners of his Torrens action; and (3) whether res judicata[2] bars the claims of the landowners who were personally named and served in the Torrens action.

Our decision can be summarized as follows. First, we conclude that reasonable access rights to the Taylor Ranch are available to Costilla County landowners who are successors in title to the original settlers of Beaubien's grant. For practical purposes, landowners who are able to trace the settlement of their property to at least the time of William Gilpin's ownership of the Taylor

Ranch shall be deemed successors in title to the original settlers of Beaubien's grant.

Second, we hold that the publication notice given by Taylor when he initiated his Torrens action violated due process. The facts developed at trial show that Taylor knew Costilla County landowners claimed rights to use the ranch and that reasonable diligence would have identified the names and addresses of the landowners.

Third, we hold that res judicata applies and precludes the claims of those Costilla County landowners and their successors who were personally named and served in the 1960s Torrens action.

Thus, we reverse the trial court's due process/res judicata decision and return the case to the court of appeals for remand to the trial court. We direct the trial court to identify all landowners who have access rights to the Taylor Ranch and to enter all necessary and appropriate orders to safeguard those rights.

## I. Facts and Procedural History

In order to fully understand the due process and res judicata issues before this court today, it is important to review the circuitous procedural history that has led to today's decision. Because the facts of this case have been fully detailed in our prior decision, *Lobato I,* 2002 WL 1360432 at *1–4, 71 P.3d at 942–946, we now discuss only those facts that are relevant to the due process/res judicata inquiry presented in this case.

The petitioners, landowners in the Culebra River Drainage[3] region of Costilla County, claim access rights to the Taylor Ranch.

---

2. We have previously expressed our preference for the term "claim preclusion" over the term "res judicata." *Farmers High Line Canal & Reservoir Co. v. City of Golden,* 975 P.2d 189, 196 n. 11 (Colo.1999). As the United States Supreme Court has noted, the use of the phrase res judicata may lead to confusion because it has been used to refer to both claim and issue preclusion. *See Migra v. Warren City Sch. Dist. Bd. Of Educ.,* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). In this opinion, we use the term res judicata to be consistent with our terminology in *Rael v. Taylor,* 876 P.2d 1210.

3. On appeal, the petitioners limit their claims to landowners in an area they define as the Culebra

River Drainage, located in the southern part of Costilla County, Colorado. At trial, the petitioners identified this specific area of land in conjunction with their efforts to certify a class. The trial court never made any factual findings regarding this proposed area and whether it accurately represented the entire scope of Beaubien's grant. Subsequently, the trial court denied their motion for class certification. Because no factual findings were made regarding the proposed boundaries, we do not rely on them. Any individual able to meet the requirements set forth in this opinion will be able to claim access rights to the Taylor Ranch.

These access rights had been granted to the original settlers in Costilla County and had been utilized for over one hundred years. In 1960, Jack Taylor purchased the Taylor Ranch and forcibly excluded landowners by fencing the land. Soon after, Taylor sought to quiet title in the land via a Torrens Action[4] that he filed as a diversity action in the federal district court in Denver. Taylor's exclusive ownership of the Taylor Ranch was subsequently confirmed in 1967. *Sanchez v. Taylor*, 377 F.2d 733 (10th Cir.1967).

In 1981, the landowners filed suit in the Costilla County District Court to regain access to the land. The trial court dismissed the landowners' claims, holding that the 1960s Torrens action precluded the suit. The landowners then appealed to this court arguing that the notice publication procedure adopted by Taylor in the Torrens action violated their rights to due process. We reversed and remanded the case because of our concerns about disputed issues of material fact and the constitutional validity of the Torrens action. *Rael v. Taylor*, 876 P.2d at 1228. On remand from this court's decision in *Rael*, we directed the trial court to develop the facts and to determine whether Taylor had exercised reasonable diligence in identifying all persons who claimed interests in the Taylor Ranch and personally served them as defendants in the Torrens action. For any plaintiffs whose claims were not barred by res judicata, the trial court was to determine whether their claims to the Taylor Ranch were meritorious. To better organize the trial process, the trial court bifurcated the proceedings. One trial was held to determine which plaintiffs had been denied due process and whose claims were not barred by res judicata, and a second trial was then held on the merits of the case.

In evaluating whether res judicata barred the landowners' claims, the trial court was required to determine whether the manner in which Taylor served the plaintiffs in his 1960s Torrens action complied with due process. To comply with due process, Taylor was required to serve each individual with an identifiable interest in the Taylor Ranch whose name was also reasonably ascertainable. The trial court dismissed most of the original plaintiffs, finding that only seven could pursue their claims to the Taylor Ranch. Using proof of grazing on the Taylor Ranch as a litmus test, the trial court concluded that although all of the plaintiffs could claim an identifiable interest in the Taylor Ranch, only seven had presented sufficient evidence of grazing practices for them to be reasonably ascertainable to Taylor. Thus, under the trial court's analysis, Taylor violated due process only by not personally naming and serving these seven persons.

During the merits phase of the case, the trial court found that the seven plaintiffs possessed no substantive rights in the Taylor Ranch. The court of appeals affirmed the trial court's merits analysis and did not address the due process/res judicata decision, finding it moot. This court, in *Lobato I*, reversed the decision of the court of appeals, finding substantive rights of access through implied easements appurtenant to the land by prescription, estoppel, and prior use. The landowners now challenge the trial court's due process/res judicata decision.

## II. Analysis

In addressing the landowners' claims, we first clarify from our decision in *Lobato I* that in order to have actual access rights to the Taylor Ranch, landowners must be able to show that their lands were settled at the time of the creation of the Beaubien document in 1863. For practical purposes, this requirement can be established by tracing settlement of one's property to the time of Gilpin's ownership of the Taylor Ranch. As we will discuss, this qualification comes directly from the nature of the easements at issue in this case.

Second, we review the 1960s Torrens action to determine whether Taylor provided sufficient notice of the Torrens action to com-

---

4. Although lauded by legal scholars as a promising alternative to traditional title registration methods, practitioners have been less than enthusiastic in adopting the Torrens system. In fact, Torrens actions are so rare in Colorado that none of the three real estate experts testifying at trial had ever participated in a Torrens proceeding. *See also* Richard W. Laugesen, *The Torrens Title System in Colorado*, 39 Dicta 40, 43 (1962).

ply with due process requirements. We conclude that, under the unique circumstances of this case, Taylor did not exercise reasonable diligence in effectuating proper notice because he did not personally name and serve all reasonably ascertainable persons with an identifiable interest in the Taylor Ranch. Thus, those individuals who should have been personally named and served, and were not, are not barred from presently bringing such claims.

Third, in light of the circumstances of this case, we determine whether res judicata bars those 1960s landowners or their successors in title who were personally named and served in Taylor's 1960s Torrens action. We conclude that res judicata applies, finding that (1) public policy concerns or manifest injustice concerns do not outweigh the interests in applying res judicata; and (2) the misapplication of Colorado law by the federal courts in the 1960s Torrens action does not require waiving res judicata.

## A. Identifying Present–Day Landowners with Access Rights

■ Having concluded in *Lobato I* that successors in title to the original settlers in Costilla County were granted access rights for the reasonable use of pasture, firewood, and timber, we now specify which present-day landowners can successfully claim these access rights to the Taylor Ranch. We hold that only those landowners capable of tracing their settlement claims to the time of the Beaubien document's creation in 1863 have access rights to the Taylor Ranch. In so holding, we explain (1) why later landowners do not have implied easements in the Taylor Ranch pursuant to our decision in *Lobato I;* and (2) why, for practical purposes, landowners claiming access rights must trace settlement of their lands to at least the time of Gilpin's ownership of the Taylor Ranch.

### 1. Implied Easements were Granted only to the Original Settlers and Their Successors in Title

In *Lobato I,* we held that successors in title to the original settlers in Costilla County were granted access rights to the Taylor Ranch for reasonable use of pasture, fire-

wood, and timber through implied easements by prescription, prior use, and estoppel. *Lobato I,* 2002 WL 1360432 at *1, 71 P.3d at 942–943.

The landowners argue that these access rights should not be limited to landowners able to trace settlement claims to the original settlers, but contend that such rights should be available to all landowners in Costilla County not barred by res judicata. We disagree.

Under the evidence presented in this case, it was the unique circumstances surrounding Beaubien's Mexican land grant and his promises to the original settlers which gave rise to the implied easements providing the settlers' successors with their rights of access. These easements appurtenant to the land were all created at the same time and stem from the actions and intentions of Beaubien. As outlined in *Lobato I,* Beaubien's intentions and actions were instrumental in the creation of these rights. *Id.* at *14–16, 71 P.3d at 954–957. There is no evidence in the record to substantiate the argument that access rights to the Taylor Ranch have been created for those individuals who settled after the creation of the Beaubien document.

We thus conclude that only those present-day landowners—or their predecessors in title—who are successors in title to those persons who settled Costilla County by the time the Beaubien document was created, can claim rights of access to the Taylor Ranch for reasonable grazing, firewood, and timber.

Having determined which landowners can claim reasonable access rights to the Taylor Ranch, we now explain, for practical purposes, how the landowners can establish these rights.

### 2. Settlement Rights Must be Traced to the Original Settlers of Beaubien's Grant

■ In order for present-day landowners to legally gain access rights to the Taylor Ranch, they must first establish that their predecessors in title *settled* their lands at the

time of the Beaubien document's creation.[5] Because of the practical impossibility of establishing the exact time of settlement, we hold that a landowner claiming access rights to the Taylor Ranch need only show that his or her land was settled at the last possible time that Beaubien's intentions remained in force. Using the best available evidence, landowners must prove by a preponderance of the evidence that their property is included within the boundaries of property owned or occupied by settlers during the time of Gilpin's ownership of the lands of the Sangre de Cristo grant.[6]

The Mexican government awarded the Sangre de Cristo grant to Beaubien on the condition that he settle the land. To perfect his grant, Beaubien recruited farm families to settle by promising access rights to mountainous lands like the Taylor Ranch. *Lobato I* at *1–2, 71 P.3d at 942–944. Evidence of Beaubien's promise to give settlers access rights to the land provided the basis for the implied rights to pasture, firewood, and timber. *Id.* at *8–9, 71 P.3d at 948–950. Although these families began settling in the 1850s, many of these settlers did not receive the deeds to their lands until 1863, or even later after Beaubien's death in 1864. *Id.* at *2, 71 P.3d at 943–944.

After Beaubien's death, his lands were sold to Gilpin pursuant to an oral agreement previously negotiated between the two men. In this agreement, Beaubien kept his promise to the settlers and made the sale contingent on Gilpin's agreement to confirm the access rights of the settlers. This agreement is evidenced in the 1864 Gilpin agreement, which states:

> [Gilpin agrees to the] express condition that the settlement rights before then con-

ceded by said Charles Beaubien to residents of Costilla, Culebra & Trinchera, within said Tract included, shall be confirmed by the said William Gilpin as confirmed by him.

Because of this agreement between Beaubien and Gilpin, the original settlers who received title from Gilpin also possessed access rights to the Taylor Ranch.[7] Thus, landowners of Costilla County who are able to show that their property was settled during the time of Gilpin's ownership of the Sangre de Cristo grant or earlier will be granted access rights to the Taylor Ranch for reasonable grazing, timber and firewood.

## B. Due Process Requirements of the Torrens Proceeding

Having established which present-day landowners may claim access rights to the Taylor Ranch, we now consider whether Taylor's efforts in notifying potential claimants of his intent to quiet title in the Taylor Ranch were adequate to comply with the requirements of due process. The constitutional sufficiency of Taylor's 1960s Torrens action turns on whether Taylor provided sufficient notice to the landowners to extinguish their property claims in the Taylor Ranch. If the action was not constitutionally sufficient to meet due process requirements, the landowners will not be barred from bringing present-day claims.

To resolve this issue, we review and detail what notice is required by due process. Next, we apply that standard to the facts and evaluate whether the steps taken by Taylor in his attempt to notify interested parties were sufficient to bar future claims.

---

5. During the merits phase of the trial court proceeding, the court specifically found that the seven plaintiffs could trace their titles to the time of Gilpin's ownership of the Taylor Ranch. Thus, these individuals need not prove their claims to the Taylor Ranch.

6. We emphasize that the landowners need not prove a marketable chain of title for their property. As stated in the text, the landowners must use the best available evidence to prove their lands are benefited by the easements Beaubien granted. From the record before us, it appears that the best evidence of benefited properties

conveyed by Beaubien is the official 1894 Costilla County survey and inventory of lands held by individuals along the Culebra, Vallejos, and San Francisco Creeks. Of course, we do not foreclose the landowners from presenting other evidence to prove their settlement claims.

7. We recognize that this standard may be over-inclusive, but considering the grave depravation of rights suffered by the landowners over the past 40 years, we are unwilling to create a standard which may again unlawfully deny some landowners their guaranteed access rights.

### 1. Notice Required by Due Process

The Torrens Title Act is a long-standing, seldom-used feature of Colorado real property law. It is intended to simplify the transfer of title and create certainty by strictly limiting attacks on a title registered under the Act. For example, a challenge must be initiated within 90 days of registration and successful claimants may recover only damages, not property rights. § 38–36–131, 10 C.R.S. (2002). Laudable as these goals are, however, the act must yield to the United States Constitution.

 To have a preclusive effect on the landowners' current claims, Taylor's Torrens judgment must satisfy the minimum procedural requirements of the Due Process Clause of the Fourteenth Amendment. *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). Although section 118–10–31, 5 C.R.S. (1953), of the 1960s Torrens Act forecloses any challenges to a court's decree in a Torrens action and although the essential purpose of the Torrens Act is to eliminate attack on decrees of confirmation, the Torrens bar on future challenges cannot be sustained where constitutional deficiencies of notice are present. *Rael v. Taylor*, 876 P.2d at 1224 (citing *Petition of Brainerd Nat'l Bank*, 383 N.W.2d 284, 287 n. 2 (Minn.1986); *Riley v. Pearson*, 120 Minn. 210, 139 N.W. 361, 366 (1913)).

In the seminal case *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950), the United States Supreme Court recognized that before an action that will affect an individual's interest in life, liberty or property is commenced, state law must provide interested parties with "notice reasonably calculated, under all the circumstances, to apprise [the parties] of the pendency of the action and afford them an opportunity to present their objections." (citations omitted).

The central issue in *Mullane* involved the actions of the Central Hanover Bank and Trust Company in establishing a common trust fund from a total of 113 smaller trusts.

This merging of trusts affected the respective property rights of the beneficiaries of these trusts and their ability to control their assets. The only notice given to the beneficiaries of this created common trust was through publication in a local newspaper.

The Court held that although publication notice for beneficiaries whose interests or addresses were unknown was sufficient to comply with due process, the trustee had erred in not personally notifying those beneficiaries whose names and addresses were easily obtainable. *Id.* at 317, 70 S.Ct. 652. In explaining its reasoning, the Court stated that

> "[t]he reasonableness and hence the constitutional validity of any chosen method [of notice] may be defended on the ground that it is in itself reasonably certain to inform those affected ... or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes."

*Id.* at 315, 70 S.Ct. 652 (citations omitted). Under this standard, the Court disapproved of notice by publication for those beneficiaries whose identities and addresses were known because publication was not "reasonably calculated" to provide actual notice.[8]

As to unknown beneficiaries, the Court concluded that notice by publication was sufficient to satisfy due process requirements. The Court reasoned that although the chance that these beneficiaries would be notified by publication was remote, the publication would be as effective as any other method to notify the unknown beneficiaries. *Id.* at 317, 70 S.Ct. 652.

In subsequent cases, the United States Supreme Court has held to the principles of due process outlined in *Mullane*. *See Walker v. City of Hutchinson*, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956) (finding notice of condemnation proceeding published in a local newspaper inadequate to inform an affected landowner whose name was known to the city and in official records); *Schroeder v. City of New York*, 371 U.S. 208, 83 S.Ct.

---

**8.** As an alternative to personal service, the *Mullane* Court recognized that service could be adequately undertaken via ordinary mail. *Id.* at 318, 70 S.Ct. 652.

279, 9 L.Ed.2d 255 (1962) (holding that publication by newspaper and through posted notices was insufficient to alert property owner of condemnation proceedings where name and address were easily ascertainable from deed records and tax rolls); *Greene v. Lindsey*, 456 U.S. 444, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982) (concluding that posting a summons on the door of a tenant's apartment was inadequate to provide notice of forcible entry and detainer actions); *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983) (finding publication and posting of a tax sale of a property was insufficient to notify a mortgagee whose address was reasonably ascertainable and whose interest was publicly recorded).

■ In *Rael*, we followed the United States Supreme Court's reasoning in *Mullane*. We held that to evaluate the sufficiency of publication notice, due process requires a court to determine "whether under all the circumstances the means selected was reasonably calculated to reach interested parties and whether the party giving notice had exercised due diligence to ascertain the identities of interested parties." *Rael v. Taylor*, 876 P.2d at 1225. This determination of reasonable diligence is an objective test. We look to the actions that a reasonably prudent applicant would have taken under the circumstances, either known or reasonably discoverable by the applicant at the time of filing, to guarantee that interested parties would be identified and served as named defendants. *Id.* at 1226–27. In reference to Torrens Act proceedings specifically, "applicants have a duty to exercise reasonable diligence in identifying all reasonably ascertainable persons *who claim interests in the property and are thus entitled to personal service.*" *Id.* at 1226 (emphasis added). Furthermore, a search for reasonably ascertainable interested parties need not extend beyond what would be discoverable by diligent inquiry into the public records. *Id.* at 1228 n. 26.

We were unable to apply that test in *Rael* because the facts were not sufficiently developed. *Id.* at 1128. With the facts now before us, we evaluate whether Taylor was required to personally name and serve the plaintiff landowners in his Torrens action. More specifically, we must determine whether Taylor exercised reasonable diligence in discovering all claimants (1) who claimed an identifiable interest in the Taylor Ranch, and (2) whose identities were reasonably ascertainable.

### 2. Identifiable Interest

The circumstances surrounding Taylor's 1960s Torrens action lead us to conclude that at the time of the Torrens action, all landowners in Costilla County possessed an identifiable interest in the Taylor Ranch.

■ The trial court in this case found that under the Beaubien document, all the plaintiffs before the court could claim an identifiable interest in the Taylor Ranch. Taylor now argues that the landowners fail to meet this element of the due process analysis, contending that they, as landowners, have no identifiable interest in the Taylor Ranch and that he and his attorneys exercised reasonable care and due diligence in individually naming defendants in his Torrens application. We agree with the trial court determination and find Taylor's argument to be without merit.

Taylor mistakenly assumes that the due process requirements set forth in *Mullane* and its progeny require that, in order for a party's interest to be identifiable, the interest must either be recorded or the party must be in open possession of the interest. Although an "identifiable interest" usually is associated with a recorded interest or an interest that is obvious via actual possession, the case before us is not the usual case. To the contrary, this is a highly unusual case that proves the Supreme Court's admonishment that constitutionally sufficient notice must be determined by examining the circumstances of each individual case. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. at 314–15, 70 S.Ct. 652. Taking into account the information contained in the Beaubien document, the 1864 Gilpin agreement, Taylor's own deed, the title examiner's report, and other extrinsic facts, Taylor's argument that he could not have reasonably identified and named the landowners must fail.

First, the language of the Beaubien document, the 1864 Gilpin agreement, and Taylor's own deed would have provided a reasonable applicant in Taylor's position with adequate notice that some landowners in Costilla County might have some interest or claim in the Taylor Ranch. Taylor knew he was buying land within the Sangre de Cristo Mexican land grant. The Jenkins translation [9] of the Beaubien document unequivocally provides that

> [i]t has been decided that the Rito Seco lands shall remain uncultivated for the use of the residents of San Luis, San Pablo and the Vallejos, and other inhabitants of said towns, for pastures and community grounds, etc. . . . All the inhabitants shall have the use of pasture, wood, water, and timber and the mills that have been erected shall remain where they are, not interfering with the rights of others.

Although Taylor might credibly contend that the language of the Beaubien document alone was insufficient to provide him with reasonable notice of potential claimants, this argument fails when the Beaubien document is combined with the language in the other two noted documents.

The instrument of conveyance of the Sangre de Cristo grant to Gilpin from Beaubien's heirs in 1864—contained in Taylor's chain of title—also clearly provides notice to the average reader that landowners in Costilla County might credibly claim access rights to the Taylor Ranch. The Gilpin agreement expressly conditions conveyance to Gilpin on the requirement that "certain settlement rights before then conceded by said [Carlos] Beaubien to residents of the settlements of Costilla, Culebra & Trinchera . . . shall be confirmed by said William Gilpin."

Finally, Taylor's own deed specifically provides that "All of the land hereby conveyed . . . being subject to claims of the local people by prescription or otherwise to right to pasture, wood, and lumber and so-called settlements [sic] rights in, to and upon said land." With these three documents at his disposal, it is clear that Taylor was on notice that landowners in Costilla County might have an interest in the Taylor Ranch.

In addition to these three documents, Taylor was notified of the landowners' claims through his lawyer who handled the Torrens proceedings. We noted in *Rael* that Taylor's lawyer, Raphael Moses, Esq., had personal knowledge of the claimed interests of the landowners and even acknowledged these interests in 1949 in a letter to some of the same landowners he sought to exclude in the 1960s Torrens action:

> In 1936, Mr. Albert L. Moses gave an opinion to Mr. J.J. Valdez and Mr. J.E. Sanchez that the *owners of land in the Grant who obtained their title through those originally settling the land have the right to go upon the timbered portions of the Grant and take therefrom the necessary fire wood for their own personal uses and the necessary timber for use in connection with the land which they own . . .* and likewise have the right to pasture their own domestic animals, not by herding them upon the land but by permitting them to graze thereon.
> *We still believe that this is the case and that you would have the right to stop anyone who interferes with these rights.*

*Rael v. Taylor*, 876 P.2d at 1215 n. 7. *See also* Tom Faxon, "An Oral History: Raphael J. Moses," *The Colorado Lawyer*, March 1998, Vol. 27, No. 3, 115 (interview with Moses explaining that the 1960s Torrens action was filed roughly 250 miles from Costilla County in federal court in Denver to avoid possible conflicts with landowners over their access rights).

At the time Taylor commenced his Torrens action, there were approximately 1,913 landowners in Costilla County. Although we recognize that the land referenced in the Beaubien document is not coextensive with the boundaries of Costilla County, other information available to Taylor in the 1960s put Taylor on notice that *all* landowners in Costilla County had potential claims in the Taylor Ranch. The Torrens title examiner's report and other extrinsic information available to Taylor provided such notice.

---

**9.** The trial court found that the Jenkins translation was a true and accurate translation of the Beaubien document from the Spanish to English language.

The court-appointed title examiner assigned to conduct the investigation concerning Taylor's Torrens application was W.W. Platt. In his report, Platt noted that claim rights to the Taylor Ranch to take pasture and wood were asserted by the Association of Civic Rights, which represented *"all owners of land in Costilla County."* Although Taylor was aware of the Association of Civic Rights and its asserted interests in the Taylor Ranch, he made no effort to name all landowners in Costilla County.[10] In fact, he failed to name these individuals even though his Torrens application specifically addresses the Association of Civic Rights and its claim to usufructuary rights in the Taylor Ranch.

Although Taylor noted in his application that the individuals represented by the Association of Civic Rights were claiming rights to pasture and wood *as landowners,* Taylor argued that this status did not provide them with any identifiable rights in the Taylor Ranch. This contention loses its credibility when considered in light of the title examiner's report. In Platt's report evaluating the propriety of Taylor's Torrens application, the examiner specifically notes that 269 of the people specifically named by Taylor were named only because of their status as landowners. As Platt unequivocally concluded, the only possible interest these 269 people have in the Taylor Ranch would be as "landowners in Costilla County claiming such rights to pasture and wood *solely because they are such landowners."* (emphasis added). Because these 269 individuals were named in his Torrens application, logic should have dictated that Taylor also name all landowners in Costilla County, considering that both groups claimed their respective interests in the Taylor Ranch solely as landowners of Costilla County.

In sum, as established by the details of Taylor's knowledge in the 1960s, it is clear that Taylor possessed adequate notice that all of the landowners of Costilla County claimed an interest in the Taylor Ranch. Having concluded that Taylor should have recognized that all the landowners of Costilla County claimed an identifiable interest in the Taylor Ranch, we now evaluate whether the identities of these landowners were reasonably ascertainable by Taylor.

### 3. Reasonably Ascertainable Individuals

■ With respect to whether the 1960s landowners were reasonably ascertainable by Taylor at that time, the landowners contend that the trial court erred in concluding that the identities of the great majority were not reasonably ascertainable. Conversely, Taylor agrees with the trial court and argues that, aside from those landowners whom he specifically named, he could not have reasonably ascertained other landowners who claimed an interest in the Taylor Ranch. We disagree with Taylor's assertion and conclude that the trial court ruling was incorrect. Having established that through reasonable diligence, Taylor knew or should have known that all 1960s landowners in Costilla County claimed an interest in the Taylor Ranch, we now conclude that the landowners were reasonably ascertainable and could have been personally notified rather than served by publication.

Specifically, we conclude that the trial court erred in (1) finding that the examination of real estate records was sufficient to locate interested individuals; and (2) relying on grazing as the test for whether the plaintiffs were reasonably ascertainable.

■ First, the trial court was mistaken in concluding that Taylor was only required to search and examine the real estate records of the Clerk and Recorder in order to diligently ascertain those individuals with an identifiable interest in the Taylor Ranch. Because Taylor had knowledge of the claimed interests of the landowners in Costilla County, reasonable diligence required Taylor to search the Costilla County tax rolls as well.

■ Although, generally, only documents within a chain of title must be searched to determine relevant interests in real property, more is required where it appears that outside interests may affect title. In such in-

10. Even if Taylor was made aware of these claimants only after his Torrens application, he was still responsible for providing them with adequate notice. *See Bray v. Germain Inv. Co.,* 105 Colo. 403, 408, 98 P.2d 993, 995, (1940).

stances, an individual has a duty to investigate these other interests and is charged with knowledge of the facts to which the investigation would have led. *Collins v. Scott,* 943 P.2d 20, 22 (Colo.App.1996) (citations omitted).

That it is sometimes necessary to look beyond standard forms and legal methods is demonstrated by our decision in *Jacobucci v. Dist. Ct.,* 189 Colo. 380, 388, 541 P.2d 667, 672 (1975). In *Jacobucci,* the City of Thornton initiated eminent domain proceedings against, among others, Farmers Reservoir and Irrigation Company, a mutual ditch company organized by local farmers to enable them to receive irrigable water for their farms. *Id.* at 386, 541 P.2d at 671.

Thornton served only the corporation. *Id.* at 384, 541 P.2d at 669. Finding the individual farmer-shareholders indispensable to the eminent domain proceedings, however, we recognized that the unique circumstances surrounding the creation of mutual ditch companies in Colorado required that we look beyond general corporate law principles. *Id.* at 390, 541 P.2d at 674. Although recognizing that shareholders are generally not considered real parties in interest in condemnation actions, we cautioned that "[d]eductions made from the application of general legal concepts may be dangerously inappropriate as applied to specific contexts." *Id.* at 389, 541 P.2d at 673. In looking beyond legal forms, we reasoned that the farmer-shareholders were real parties in interest because, in practical terms, "[t]he productivity and value of [the farmer-shareholder's] lands, as well as the assurance of their livelihoods, is ... entirely dependent upon the continuing flow of water.... No court can ignore the magnitude of [disruption] which would result in a successful condemnation action." *Id.* at 391, 541 P.2d at 675. We thus required Thornton to individually serve shareholders

whose water would be impacted by the condemnation. *Id.* at 392, 541 P.2d at 675–76.

The challenges of farming in an arid climate gave rise to the mutual ditch company, an entity that does not easily fit within the confines of corporate law and condemnation actions. We directed that the corporation be disregarded and notice be given to the farmers who had the most to lose in the condemnation action.

The logic of *Jacobucci* applies with equal force here because the facts in this case also reflect the harsh realities of farmers' lives in southern Colorado. The access rights made farming possible in Costilla County. Given Taylor's knowledge of those access rights, he could not pick and choose whom to notify personally and whom to notify only by publication. Under the circumstances of this unique case, reasonable diligence required that Taylor personally name and serve all landowners in Costilla County.

As noted in *Rael,* the reasonable diligence standard requires that " '[w]here the names and post office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency.' " *Rael v. Taylor,* 876 P.2d at 1225 (citing *Mullane v. Cent. Hanover Tr. Co.,* 339 U.S. at 318, 70 S.Ct. 652). *See also Schroeder v. City of New York,* 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (names and addresses are easily ascertainable from tax rolls); *see also Mennonite Bd. of Missions v. Adams,* 462 U.S. at 798 n. 4, 103 S.Ct. 2706 (mortgagee easily ascertainable where only known address listed mortgagee as " 'corporation, of Wayne County, in the State of Ohio' ").

According to the record, the Costilla County tax rolls provided the names and addresses of every landowner in Costilla County. At trial, Frederick B. Skillern,[11] an expert in the

11. The trial court heard testimony from three qualified real estate experts, Skillern, Don Lesher, and Willis Carpenter. These experts provided testimony analyzing the Torrens Act and this court's decision in *Rael,* to provide an opinion on what steps a reasonably prudent applicant would take to exercise reasonable diligence in naming and ascertaining all persons claiming an interest in the Taylor Ranch. The trial court found Carpenter's testimony most credible and

from this testimony concluded that the only relevant public record that required search and examination was the real estate records of the Clerk and Recorder. The trial court's credibility finding is not a bar to us. These were not fact witnesses but rather lawyers offering their legal opinions. Carpenter's testimony was based on his opinion that the Beaubien document did not create or convey any rights—a position we have rejected as a matter of law. He conceded that

field of real estate law, testified that Taylor could reasonably have accessed the public tax records to obtain the names and addresses of landowners in Costilla County and that the information therein would have been sufficient to effectuate service of process to said landowners. Skillern also testified that Taylor should have conducted this search in order to properly comply with the notice required by due process.

In reviewing the record and relevant case law, we agree with the landowners and conclude that they were reasonably ascertainable by Taylor through a basic search of the tax rolls. Because the names and addresses of the landowners were available through the tax rolls, Taylor's efforts in discovering potential claimants to the Taylor Ranch were not reasonably diligent to comply with due process. Although the number of names and addresses of the landowners might have been large,[12] the process was not complex or difficult.

■■■■ Second, the trial court arbitrarily applied proof of grazing as a litmus test to determine whether each plaintiff was reasonably ascertainable by Taylor and thus should have been named and served. The trial court's test stated that, "[Taylor] had a duty to ascertain the identity of owners of property that ran cattle or sheep within a reasonable proximity to [his] land and name and personally serve such person."

The trial court's reliance on grazing alone is inconsistent with our decision in *Lobato I*, which found rights of access for firewood, timber, and grazing. Therefore, we conclude that the trial court erred in relying solely on proof of grazing to determine which plaintiffs were reasonably ascertainable by Taylor.

As a whole, when taking into account the expert testimony and information at Taylor's disposal at the time he filed his Torrens application, it is clear that Taylor's actions were not sufficiently diligent to comply with due process. Under the circumstances surrounding this case in the 1960s, a reasonably

diligent applicant would have personally served all landowners in Costilla County whose names and addresses were available in the county's tax records. Therefore, the claims made by all present-day landowners or their predecessors in title not personally named or served in the 1960s Torrens action are not barred from asserting their claims now, because they cannot be deemed as parties to the Torrens action. As for those landowners or predecessors in interest who were actually served in the 1960s Torrens action, we now explain why they are barred by res judicata from claiming access rights to the Taylor Ranch.

## C. Res Judicata Bars Those Landowners Personally Named and Served in the 1960s Torrens Action

Having concluded that Taylor's efforts in notifying potential claimants of his Torrens action were inadequate to comply with the requirements of due process and thus bar the claims of present-day landowners, we now consider whether res judicata should be applied to bar the claims of those individuals who were personally named and served in Taylor's 1960s action to quiet title in the Taylor Ranch. The landowners argue that res judicata should not be applied based on the 1960s Torrens action because of the unique circumstances surrounding this case. We disagree.

■■■■ The operation of res judicata works to preclude the relitigation of matters that have been litigated already as well as matters that could have been litigated in a prior proceeding. Wright, Miller, & Cooper, *Federal Practice and Procedure:* Jurisdiction 2d § 4403, 20 (2002). In barring the relitigation of tried matters, res judicata serves distinct and important public and private values. As the United States Supreme Court has stated, res judicata serves "the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy

the assessor's records would be the easiest way to identify landowners.

**12.** At trial, Dr. Robert A. Bardwell, a statistics expert, testified that the 1959 Costilla County tax rolls listed 1,913 landowners in the County. He further testified that, at most, 273 of these landowners were named in Taylor's Torrens action.

by preventing needless litigation." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (citations omitted). Underlying these purposes of finality and efficiency is the vital interest in preserving the integrity of the judicial system. Wright, Miller, & Cooper, *Federal Practice and Procedure:* Jurisdiction 2d § 4403 at 23. Specifically, if one matter could be easily relitigated with inconsistent results, judicial integrity would be compromised and the value of and respect for court rulings would be seriously devalued. Although exceptions to the application of res judicata have been allowed in instances where such application would undermine an important state public policy or result in manifest injustice, *United States v. LaFatch,* 565 F.2d 81, 83 (6th Cir.1977), after the United States Supreme Court's decision in *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 401, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981), such exceptions are extremely rare.

The landowners offer three reasons for why res judicata based on Taylor's 1960s Torrens action should not apply to this case. First, the landowners argue that res judicata cannot be applied because the federal court in the 1960s action incorrectly applied Colorado law. Second, they argue that application of res judicata would create a manifest injustice in the tightly-knit community because certain landowners would have access to the Taylor Ranch while others would not. Finally, the landowners contend that the application of res judicata here would be contrary to the public policy in Colorado recognizing implied rights in land. Although we recognize that there are occasions in which res judicata cannot and should not be applied, none of the arguments offered by the landowners convinces us that the circumstances surrounding the 1960s Torrens actions present such an occasion.

 First, the landowners argue that misapplication of the law should limit the application of res judicata. Specifically, the landowners contend that res judicata should not be applied because the United States District Court and the United States Court of Appeals of the Tenth Circuit in *Sanchez v. Taylor,* 377 F.2d 733, wrongly interpreted

Colorado law in holding that the landowners had no access rights to the Taylor Ranch as evidenced by our decision in *Lobato I.* We disagree.

 The application of res judicata is not thwarted simply because a prior, final ruling was based on law subsequently overruled. *See Precision Air Parts, Inc. v. Avco Corp.,* 736 F.2d 1499 (11th Cir.1984) (finding res judicata applicable despite a subsequent reinterpretation of Alabama's statute of limitations no longer barred claims as untimely filed). Res judicata cannot be so easily avoided here simply because the federal courts in the 1960s's Torrens action misinterpreted Colorado law. *See Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. at 398–99, 101 S.Ct. 2424 ("the res judicata consequences of a final, unappealed judgment on the merits [are not] altered by the fact that the judgment may have been wrong.... 'The indulgence of a contrary view would result in creating elements of uncertainty and confusion and in undermining the conclusive character of judgments, consequences which it was the very purpose of the doctrine of res judicata to avert.' ") (quoting *Reed v. Allen,* 286 U.S. 191, 201, 52 S.Ct. 532, 76 L.Ed. 1054 (1932)).

Although cases exist where a misapplication of the law has resulted in the waiver of res judicata, such cases strictly involved instances in which the legal correction was based on significant changes in fundamental constitutional rights. *See e.g., Christian v. Jemison,* 303 F.2d 52, 55 (5th Cir.1962) (res judicata not applied to state court judgment after Supreme Court overruled separate-but-equal doctrine in *Brown v. Bd. of Educ.,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)). Although the circumstances surrounding the exclusion of landowners served in Taylor's 1960s Torrens action are unfortunate, the federal courts' erroneous interpretation of Colorado law is not of such constitutional magnitude as to compel this court to overlook the long-standing and important principles supporting the application of the res judicata doctrine.

 The landowners next argue that the application of res judicata should be

waived because the bar will result in a manifest injustice whereby some landowners in the Costilla County community would be granted access rights while others would not. As expressed in *Moitie,* inequities resulting from the application of res judicata will not easily outweigh the principles supporting its application. *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. at 400, 101 S.Ct. 2424; *E.E.O.C. v. U.S. Steel Corp.,* 921 F.2d 489 (3d Cir.1990) (finding that res judicata barred the relitigation of illegal discrimination claims against an employer although some similarly situated employees were awarded relief and others were not).[13] Although the possible creation of divisions within the local community would be troubling, we do not find that these divisions would rise to the level of creating a manifest injustice.

■■■ Finally, the landowners contend that applying res judicata would be contrary to public policy in Colorado recognizing implied rights in land. Contrary to the landowners' contentions, we find that applying res judicata based on the 1960s Torrens action serves the more important general public policy interest that there be an end to litigation, *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. at 401, 101 S.Ct. 2424, as well as Colorado's interest in ensuring that real estate titles are secure and marketable. *Agee Revocable Trust v. Mang,* 919 P.2d 908, 910 (Colo. App.1996); § 38–34–101, 10 C.R.S. (2002) ("it is declared to be the policy in this state that . . . laws concerning or affecting title to real property . . . shall be liberally construed with the end in view of rendering such titles absolute and free from technical defects so that subsequent purchasers . . . may rely on the record title.") In balancing these interests, the public policy interests which favor the finality provided by res judicata outweigh any public policy interests served by recognizing implied rights in land.

Although we are sympathetic to the deeply-held views expressed by the landowners, under the law, we can find no facts, inequi-

ties, or public policy considerations which outweigh those vital purposes inherent in the application of res judicata. Thus, res judicata will bar the claims of those landowners personally named and served in Taylor's Torrens action.

## III. Conclusion

In conclusion, we clarify that reasonable access rights to the Taylor Ranch will be available for those present-day landowners in Costilla County who are successors in title to the original settlers of Beaubien's grant, proved by showing that their lands were settled at the time of Gilpin's ownership of the Taylor Ranch.[14]

Applying the due process analysis of *Rael* to the facts developed on remand, we hold that those 1960s landowners not personally named and served in the 1960s Torrens action, or their successors, are not barred from bringing their present claims. Finally, we conclude that res judicata precludes the claims of those landowners or their successors who were personally named and served in the 1960s Torrens action.

In light of our holding that Taylor failed to exercise reasonable diligence in personally naming and serving all reasonably ascertainable individuals with an identifiable interest in the Taylor Ranch, the cost of remedying this failure on remand must be borne by Taylor. In Colorado, costs are awarded to the prevailing party unless mandated otherwise by statute. C.R.C.P. 54(d). Because the plaintiff landowners have prevailed on their claims, Taylor now must pay the costs associated with identifying and notifying all persons who have access rights to the Taylor Ranch.

The case is returned to the court of appeals for remand to the trial court. We direct the trial court to identify all landowners who have access rights to the Taylor

---

13. For federal courts, the United States Supreme Court's decision in *Moitie* has virtually extinguished a general fairness exception to res judicata. Wright, Miller, & and Cooper, *Federal Practice and Procedure:* Jurisdiction 2d § 4415 at 379.

14. Due to the large number of potential claimants, the trial court should revisit the issue of class certification.

Ranch and to enter all necessary and appropriate orders to safeguard these rights.

Justice KOURLIS dissents, Justice RICE joins in the dissent.

Justice KOURLIS dissenting:

Jack T. Taylor, Jr. and his successors in interest have been litigating the title to the land at issue in this case for forty-three years, beginning in the federal district court of the district of Colorado. Because I believe that principles of res judicata, finality and certainty of title direct the outcome of this most recent proceeding, I would uphold the findings and conclusions of the trial court as to due process and res judicata. Therefore, I respectfully dissent from the portion of the majority opinion that reopens this controversy and grants rights to landowners who are able to trace their settlement claims [1] to the time of Williams Gilpin's ownership, provided that they were not named and served in the 1960's Torrens Title action.

## I. Facts and Procedural History

In 1960, Jack T. Taylor, Jr. purchased the mountain tract of the Taylor Ranch estate. Because he knew that there was a cloud on his title arising out of uses historically made of that property by some inhabitants of the area, he sought to clear up any ownership disputes by commencing a Torrens action. He filed the action in the federal district court, on the basis of diversity jurisdiction predicated on his status as a resident of North Carolina. In his application, he named and served 316 defendants individually who he anticipated could have sought to assert a claim against his property. During the course of the Torrens proceedings, he named and served 142 additional defendants at the instigation of the court, based upon testimony of the court-appointed title examiner, who opined that the compilation of named defendants were the only individuals

who had a possible interest in the property as landowners of Costilla County.

The federal district court confirmed Taylor's title in an order in 1965, finding that the defendant claimants had no rights of any kind or nature to the estate. Specifically, the court denied the three grounds upon which the claimants attempted to assert their rights. First, the court found that any rights the original settlers asserted under Mexican law did not survive the acquisition of lands by the United States. Second, the court found that the Beaubien document conveyed no rights by express grant or dedication, it did not mention the lands comprising the mountain tract and it did not contain language of conveyance. Finally, the court found that the claimants had not acquired any rights through their previous uses of the land by prescription or adverse possession, because they could not establish the requisite exclusivity, hostility, or adversity to ownership. Two years later, the Tenth Circuit Court of Appeals approved the court's reasoning and affirmed entry of the Torrens decree.

Taylor acquired additional adjacent lands in 1973, known as the Salazar Estate. The Salazar Estate was the subject of a quiet title action in 1960, and the successful owner recorded his deed and then conveyed his title.

Beginning in 1978, Taylor subdivided portions of the properties and sold off the parcels. Three years later, in 1981, petitioners filed suit in the district court for Costilla County, initially attacking the Torrens decree and attempting to quiet title to the mountain tract. They claimed usufructuary rights in the mountain tract to fish, hunt, recreate, gather firewood, harvest timber and graze cattle and sheep.

On Taylor's motion on the pleadings, the trial court entered judgment denying the claimants' assertion of rights. The court

---

1. The majority requires that prospective claimants document that they currently own a parcel of land, a portion or all of which was settled during the Gilpin era. Whether or not the occupants of the parcel exercised the rights claimed on Taylor Ranch for the one hundred and fifty years since that time, the majority offers those occupants a legal interest in Taylor Ranch.

By bypassing a requirement that the claimant trace his or her title back to an owner during the Gilpin era, I fear that the majority has created a circumstance in which these rights may come as a windfall to individuals who have no history in the area, no tie to people who actually exercised the rights and no legal entitlement.

found that because of the prior Torrens proceedings and decree, res judicata and statutes of limitations barred all of petitioners' claims. The court of appeals affirmed and the claimants sought certiorari before this court.

On review before this court in 1994, claimants argued that res judicata did not bar their claims, because they did not receive constitutionally adequate notice of the Torrens action. Specifically, the claimants contended that they were readily ascertainable parties due personal notice of the Torrens proceedings, because their interests were recorded in the Costilla County records, were referenced in both Taylor's deed and the Gilpin agreement, were mentioned in the title examiner's report, and were referred to in Taylor's own application. *Rael v. Taylor,* 876 P.2d 1210, 1227 n. 26 (Colo.1994). This court observed that in a Torrens proceeding, an applicant must personally serve known parties, but may give notice to unknown parties by publication. *Id.* at 1222.

The court determined that the legislature intended to "require applicants to exercise reasonable diligence in ascertaining the names and addresses of persons having any interest in the subject property and therefore required to be listed in the application and personally served." *Id.* at 1227. The court declared that the burden of proving that notice was inadequate rests on the party challenging the Torrens decree. However, the court concluded that because the record was not fully developed, a material fact remained as to whether the claimants would be able to satisfy their burden of showing that Taylor should have known their names and personally served them when he filed his application in 1960. *Id.* at 1222. Thus, this court concluded that the record was inadequate to determine the constitutionality of the notice upon which the Torrens decree was predicated. *Id.* at 1219.

Three justices dissented on the grounds that res judicata did bar the claims and that notice was sufficient. The chief issue on which the majority and dissent disagreed was what a Torrens petitioner was required to do in order to "ascertain the identities of otherwise 'unknown' claimants, that is, claimants whose names or interests do not appear in the record chain of title and who are not in possession of the land." *Id.* at 1231 (J. Vollack, dissenting). The dissenting justices feared that the majority had exaggerated the constitutional requirement, imposing a duty on Torrens applicants "to search for a potential claimant beyond public records or beyond inspecting the land to ascertain who was in possession," in spite of the United States Supreme Court's directions in *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 317, 70 S.Ct. 652, 94 L.Ed. 865 (1950) that there is "no requirement of 'impracticable and extended searches' to locate those beneficiaries whose interests were remote." *Rael,* 876 P.2d at 1234. The dissent cited other Court precedent for the proposition that, "One is not required to undertake 'extraordinary efforts to discover the identity and whereabouts of a [claimant] whose identity is not in the public record.' " *Id.* at 1234 (quoting *Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 799 n. 4, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983)). Further, the dissent posited that even if the majority's standard was correct, the determination of whether Taylor exercised reasonable diligence was a question of law for the court, not an issue of fact that required remand to the trial court. *Id.* at 1235.

The majority remanded the case to the trial court for the purpose of determining whether the claimants were readily ascertainable persons who had an interest in the property and who had, thus, been entitled to personal service of notice of the Torrens action. To the extent the plaintiffs were such readily ascertainable persons with an identifiable interest, the majority held that they had been denied due process and, as to them, the Torrens action could not stand.

On remand, the trial court bifurcated the subsequent proceedings, first addressing the notice issues. The plaintiffs claimed an interest in the property as landowners in Costilla County, who were not named and personally served in the 1960 Torrens action, but whose names were readily ascertainable in the records of the Assessor of Costilla County. The defendant claimed that he had exercised reasonable diligence in identifying the

persons claiming an interest in his property under the Beaubien document. Specifically, he offered evidence that he obtained an abstract of title that identified all persons who had claimed any interest of record in the property and that he named and served those individuals. Second, he offered evidence that he undertook an inspection of the property and named and served all individuals who were occupying or using the land. The real issue of contention in this phase of the trial court proceeding was: could Taylor reasonably rely upon the real property records maintained by the Clerk and Recorder of Costilla County for the purpose of identifying individuals with an asserted interest in the property? The trial court agreed with defendant and his real estate experts that such reliance was reasonable and sufficient. Specifically, the court noted that the Assessor's records could serve to provide addresses for otherwise identified individuals, but were in no sense indices of title. The court then found that the claimants were not identified either in Taylor's abstract of title or the real property records, and therefore were only entitled to personal service if they had an identifiable interest in the land by their occupancy of the land. Eliminating all other parties, and refusing to certify a class action, the court found only eight potential claimants who had a readily ascertainable interest and who had not been personally served with notice.

At a later point in time, the court moved to the proceeding on the merits. In that proceeding, the court refused to permit the claimants to assert rights based on prescription, finding that the claimants had added a claim for prescriptive rights at a very late point in the litigation and should therefore not be allowed to pursue it. The court also found that although four of the claimants were barred from asserting rights to the mountain tract because they or their predecessors were named in the Torrens action, those same claimants had corresponding identifiable rights to the Salazar estate and had not been personally named and served in the quiet title action. Another claimant was eliminated because he acquired his property many years after the Torrens action. The court did uphold the rights of two individuals to use roads on the Taylor estate necessary to access their adjudicated water rights. For the remaining parties, the court considered whether the Beaubien document legally or factually established rights of use. The court found that the document did not pertain to the lands of the mountain tract or the Salazar estate. Further, the court found that the Beaubien document was merely a writing of regulations of the earlier territory, rather than a document of conveyance, hence no rights were ever conveyed. Thus with the exception of access rights for the two individuals with separate water rights, the court dismissed all claims with prejudice.

The court of appeals affirmed and this court granted certiorari again. This court reversed the substantive rulings of the trial court, holding that even though the Beaubien document did not expressly grant any rights, the claimants acquired rights through prescription, estoppel and prior use. I dissented from that conclusion; however, it is now the law of the State and it is from that junction that the present opinions, both the majority and this dissent, flow. Today, the court reverses the trial court's holdings regarding sufficiency of notice. I suggest that, even given the majority's earlier conclusions as to the rights established by the Beaubien document, the trial court's rulings on Taylor's due diligence search and inquiry should stand.

## II. The Majority Opinion

I first note an inconsistency between this court's 1994 opinion in *Rael* and the present opinion. The majority here determines, as a matter of law, that all landowners in Costilla County were entitled to notice of the Torrens Action. In *Rael,* the court specifically rejected any such conclusion, and rather carved out a question of fact and returned that question of fact to the trial court. The trial court then reached principled findings, grounded in law and evidence, regarding the identity of the various individuals whose interests were readily ascertainable. The majority court reverses those findings, now holding as a matter of law that all landowners in the County had readily ascertainable interests. If the court had so intended, a remand to the trial court in 1994 would not

have been necessary. Accordingly, I read the majority opinion as contravening our earlier opinion in *Rael.*

More particularly, I take issue with the majority's conclusion that, as a matter of law, every individual landowner in Costilla County was a potential holder of implied or adverse rights in the Taylor Ranch. Such a broadbrush determination belies all requirements associated with the acquisition of such rights—which are, necessarily, related to the use a particular claimant may have made of the property. Certainly, an inspection of the tax records of the assessor's office could not have revealed which landowners in the county had gained rights through prescription.

The majority decision does acknowledge, rightfully in my view, that those individuals who recorded an interest, or who were using the property and were therefore personally named and served in the Torrens and quiet title actions are now barred from asserting their interests because of the operation of res judicata. Those individuals were clearly the ones with the most palpable, readily ascertainable interests. Nonetheless, the majority revives the interests of landowners in the county whose rights were so attenuated and ephemeral as to avoid ready identification by Taylor or by the court-appointed title examiner. Many of those individuals to this day remain nameless, unidentified by any party, and yet they may now, thirty years later, finally assert a claim. The simple point is that for these individuals to become legitimate parties to a Torrens action, all they had to do was file a document recording their asserted interest. That is the sanctioned, statutory process in this state designed to protect certainty of title. The individuals here who did so were precluded because they had no legitimate interest, and various courts so held. I suggest that it is unreasonable now to hold that Taylor was required to name and serve every landowner in Costilla County in order to secure title to his property. I also note, in passing, that had he done so, his title would now be secure because none of those individuals could have asserted better rights than the ones who did litigate their claims. Because I conclude that reasonable diligence does not require a landown-

er to serve all the parties in a county in case they might at some point have acquired rights by prescription or implication, and because I feel that this decision defeats the purpose of the Torrens Act by rendering Torrens decrees inconclusive, I respectfully dissent.

## III. Colorado Real Estate Title Standards

Over fifty years ago, the Colorado Bar Association (CBA) adopted title standards. 2 Cathy Stricklin Krendl, Colorado Methods of Practice § 62.33, at 148 (1998). These standards represent CBA's assessment of the manner in which experienced title examiners in the state of Colorado consider certain issues affecting the marketability of title. *Id.* Specific to our purposes, the title standards set forth the methods that a competent attorney should undertake to investigate marketability of a title so as to be able to issue an opinion to that effect. Krendl, *supra* § 62.33, at 12–13 (Supp.2002). Plaintiffs in this case argue, and the majority agreed, that a reasonable search of the title of Taylor Ranch would have included a search of the tax records of the county. The Colorado Real Estate Title Standards do not assign any such responsibility under any circumstances.

According to section 1.1.2 of the standards, an examining attorney must search "for the recorded documents which affect title to such real property ... either from a personal examination by the examining attorney of the *real property records* of the county in which such real property is located or from an examination of an abstract of title which purports to contain such recorded documents." Attorneys Title Guar. Fund, Inc., Colorado Real Estate Title Standards 1.1.2 (1997) (emphasis added) (internal citations omitted). Although circumstances may make it necessary for the examiner to inquire further, "more frequently, such matters are excepted from the scope of the examining attorney's title opinion" as outside of such circumstances, generally, "the examining attorney has no obligation to question the accuracy or completeness of the real property records of the county or the abstract of title." *Id.* at 1.1.5 (Scope of search of mat-

ters not of record). When such circumstances arise:

> Those matters outside of the real property records to which title opinions are commonly made subject include rights of parties in possession or occupancy of the real property; matters that may be disclosed by an accurate survey of the real property; statutory mechanics' liens, easements, or claims of easements, not shown by the public records; liens for the payment of taxes . . . .

*Id.* at 1.1.5.

These materials all relate specifically to the land at issue and to real property in general. They would all contain information as to the specific rights and statutes affecting the title to the property. By contrast, a search of tax records offers no information as to the burdens upon a piece of property, which may have arisen by prescription.

Colorado courts have recognized that "[d]ocuments outside the chain of title provide no notice unless a possible irregularity appears in the record which indicates the existence of some outside interest by which the title may be affected." *Collins v. Scott,* 943 P.2d 20, 22 (Colo.App.1996). Constructive notice is given when a document is recorded "in the office of the appropriate clerk and recorder." *Id.* However, Colorado courts have declined "to extend the presumption of constructive notice to information contained in" outside materials such as trade name affidavits. *Nile Valley Fed. S & L v. Sec. Title Guar. Corp.,* 813 P.2d 849, 852 (Colo.App.1991).

The Beaubien document was outside the chain of title and had never been recorded in the title so as to create a cloud on the Taylor title. Even if we assume that Taylor had a duty of inquiry notice arising out of that document, the duties attendant upon inquiry notice have never included those now prescribed by the majority. This court suggested in *Bray v. Germain Inv. Co.,* 105 Colo. 403, 98 P.2d 993, 995 (1940) that publication notice is not sufficient when an examiner may, by the exercise of reasonable diligence, "discover the identity of a party interested in the res." However, the court in that case considered the rights of individuals whose

identities and addresses were made known to the publishing party by the interested party's attorneys, prior to the publication. *Id.* at 994. The court noted that until their identities were made known, "reasonable diligence was exercised" and publication notice would have sufficed. *Id.* at 995.

The Federal District Court in 1965 reviewed the sufficiency of notice in the Torrens action, requiring Taylor to name and serve a number of additional parties. That determination was upheld. Again, a trial court has reviewed in detail what Taylor did, what he knew or should have known at the time, and has upheld the procedure he undertook, except as to a few claimants. This issue has been fully resolved, in accordance with prevailing law and title examination requirements. It should be allowed some postponed finality.

### IV. Torrens Title Registration: the Purpose and Procedure

Title searches are necessitated by the land title recording system used in almost every state today. The recording system traces its roots back to the earliest conveyances of real property during the colonial period. This system makes no promises to reward a diligent search, but merely invites the purchaser to inspect an index organized by the names of those parties who have recorded their interest in real estate and allows the searcher to gamble on that basis as to the certainty of his title. Roger A. Cunningham et al., The Law of Property § 11.15, at 827 (1984).

In contrast, the Torrens system of registration of title was designed to convey absolute certainty of title. Developed in 1858 by Sir Robert Torrens, the system differs from land title recording systems both in nature and result. 14 Richard R. Powell, Powell on Real Property § 83.01[2] (rev. ed.1999). Tangibly, under a recording system, the records maintained merely include evidence of the instruments of conveyance by which a title was transferred. However, under the registration system, what is registered is the actual title to the land. 42 A.L.R.2d 1388 § 1 (1955). After the title is registered, a transfer of title may only take place when the

owner voluntarily submits his copy of the registration to the registrar, who then issues a new certificate. *Id.*

Academics bemoan the uncertainty of title conveyed under the recording system, and champion the Torrens system as offering a sensible modern solution to many problems. Calls for conveyancing reform focus on three major areas of concern: 1) inadequate security for land titles, 2) speed in determination of title status, and 3) cost of assuring title. John E. Cribbet & Corwin W. Johnson, Principles of the Law of Property 347–48 (3rd ed.1989). All of these concerns are readily answered by a registration system.

The purpose of Torrens registration is to "make the title to property more certain and readily ascertainable [to] third parties." Powell, *supra*, § 83.02[1]. Unlike the traditional recording system, under a registration system it is not necessary for purchasers "to search, examine and analyze the evidence of title." *Id.* The purchaser can readily find the exact status of the title. *Id.* "No historical search of the title is ever necessary or relevant." Cunningham, *supra*, § 11.15, at 829. "The title examination process is vastly simplified and duplication of searches as successive transfers of the same land occur is eliminated." *Id.* Further, it is efficient and cost effective—in most cases a competent attorney can verify a registered title in about an hour. Cribbet, *supra*, at 351.

Most importantly, title registration affords maximum security of title. *Id.* at 352. "So long as the owner takes proper care of his *duplicate*, it is an absolute safeguard against loss of title by reason of a forged deed." R.G. Patton, *Priorities, Recording, Registration, in* 4 American Law of Property 521, § 17.41 (A. James Casner ed., 1952). The conclusiveness of the title is "of vital interest to the holder, to mortgagees who loan him money, and to anyone who is about to purchase the title from him." *Id.* at § 17.47.

The purpose of Torrens registration systems is thus accurately characterized as follows:

The objects of the [Torrens] system are as follows: First, the creation of an indefeasible title in the registered owner; second, simplification in the transfer of land; third,

certainty and facility in the proof of title by reference to a certificate issued by a government official made conclusive by law; and fourth, the saving to the community of the cost of a new examination of title in connection with each transfer or transaction affecting the land.

*State ex rel. Draper v. Wilder,* 145 Ohio St. 447, 62 N.E.2d 156, 158 (1945) (quoting 8 Thompson on Real Property, Perm. Ed., 258, § 4415).

Registration statutes are voluntary rather than mandatory, and current owners have little motivation to undergo the expense of guaranteeing their title via registration unless the courts then uphold such registration decrees. It is easy to appreciate that the degree of effectiveness of title registration depends fundamentally upon "the degree to which a *certificate of title* ... is conclusive and able to withstand challenge as to the ownership of a specific parcel of real estate." Powell, *supra*, § 83.02[3][a].

## V. The Colorado Torrens Act

Colorado has adopted a system of voluntary registration under the Torrens Registration Act. When a court enters a decree of registration, that decree binds the land and quiets the title thereto, and is "forever binding and conclusive upon all persons." § 38–36–130, 5 C.R.S. (2002). The registration decree may not be attacked unless an individual holding an interest in or lien upon the land, who was not actually served with process or *notified* of the application filing, and who in fact had no *actual notice or information* of the filing, petitions to reopen the registration within 90 days of its entry and before an innocent purchaser for value has acquired an interest. § 38–36–131. All other complaints against the decree must be pursued as actions in tort or indemnity. *Id.*

Thus after 90 days, no person may attempt to recover any interest in registered land. § 38–36–132. The recipient of the registration decree and subsequent purchasers may rest confident in their absolute title. No adverse party may ever attack the estate; the property is protected even against adverse possession. § 3–36–137 ("No title to

registered land in derogation of that of the registered owner shall ever be acquired by prescription or adverse possession."). The decree is an agreement forever running with the land, and all dealings with the land are controlled by the statutes of the registration act, unless the owner formally removes the land from registration. § 38–36–136.

## VI. Relevant Case Law

This court has long upheld the validity of Torrens registration decrees against attack. As early as *People ex rel. Smith v. Crissman,* 41 Colo. 450, 92 P. 949 (1907), this court upheld the constitutional validity of Torrens decrees against complaints of due process violation. A short time later, this court protected a creditor's reliance on a Torrens decree against a subsequent possessor of the property with a valid recorded interest. *Sterling Nat'l Bank v. Fischer,* 75 Colo. 371, 226 P. 146 (1924). The court observed, "the purpose of the [Torrens] act was to escape from the old rules governing the transfer of real estate." *Id.* at 147.

Other states have recognized the important role Torrens registration plays in solidifying title to real property. Comparing registration to recording, the Supreme Court of Minnesota observed that under a recording system:

> [P]rospective purchasers of real property must examine the recorded evidence of transfers and encumbrances. With the passage of time and the inevitable lengthening of chains of title, this process understandably becomes more cumbersome and uncertain. Every time title to real property changes hands, the number of documents in a chain of title increases and the encumbrances that may constitute a defect in title increase in direct proportion. Thus, many title examiners feel compelled to raise any and all possible defects, even those that may be considered de minimus, when ascertaining whether title is marketable. As a result, examination of titles becomes less efficient and the status of titles becomes less certain.

*Hersh Props., LLC v. McDonald's Corp.,* 588 N.W.2d 728, 732–33 (Minn.1999) (citing Paul E. Basye, *Trends and Progress—The Marketable Title Acts,* 47 Iowa L.Rev. 261, 261 (1962)). Comparatively, the court recognized that Minnesota's registration system "operates to vest conclusive title in the holder of a certificate of title issued pursuant to judicial proceedings." *Id.* at 733. It is the "conclusive nature of certificates of title [which] allows real property owners to rely on the certificate of title while disregarding most interests not evidenced on the current certificate of title." *Id.* at 734.

Similarly, in Massachusetts, the Supreme Court recognized that Torrens systems are "deemed advantageous since '[t]he difficulty with the [recording] system is that no one can be absolutely certain whether he is buying a good title or a bad one.... The great purpose of the Torrens System is to rid land titles of this peril, for with its disappearance disappears all the expense, trouble and delay that attend running the title back through previous transfers.' " *Kozdras v. Land/Vest Props., Inc.,* 382 Mass. 34, 413 N.E.2d 1105, 1111 (1980) (quoting Hurd, *Exposition of the Torrens System of Registration of Title, in* The Torrens System of Registration and Transfer of the Title to Real Estate 88–89 (Yeakle ed. 1894)).

The Supreme Court of North Carolina thus accurately concluded that the just purpose of the Torrens system is:

> to secure by a decree of court, or other similar proceedings, a title impregnable against attack; to make a permanent and complete record of the exact status of the title with the certificate of registration showing at a glance all liens, encumbrances, and claims against the title; and to protect the registered owner against all claims or demands not noted on the book for the registration of titles.

*State v. Johnson,* 278 N.C. 126, 179 S.E.2d 371 (1971) (quoting Frederick B. McCall, The Torrens System—After Thirty–Five Years, 10 N.C. L.Rev. 329 (1932)).

Of course, Colorado's Torrens Registration Act must comply with the due process re-

quirements of the United States Constitution. Specifically, the Torrens system may not deprive any individual of his interest in land without providing him due notice of the registration proceedings, that he may appear to assert his rights.[2]

Under *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), due process requires that any interested parties must be given notice of the proceedings that is reasonably calculated, under the circumstances, to apprise them of the action and give them an opportunity to present their objections. *Id.* at 314, 70 S.Ct. 652. While a mere gesture toward supplying notice is insufficient, personal service is not always required. *Id.* at 314–15, 70 S.Ct. 652.

The focus is whether the means adopted by the petitioner are those that a reasonable person who truly desires to reach any absent parties would use to do so. *Id.* at 315, 70 S.Ct. 652. Thus the notice must "reasonably convey the required information" and afford a reasonable time for parties to appear. *Id.* at 314, 70 S.Ct. 652. Always the "practicalities and peculiarities of the case" weigh into the consideration of the appropriateness of the notice. *Id.* A state *may* dispense with certain notice to beneficiaries "whose interests or whereabouts could not with due diligence be ascertained," "whose interests are either conjectural or future," or who "do not in the due course of business come to knowledge" even when they could be discovered upon investigation. *Id.* at 317, 70 S.Ct. 652.

While the Court noted in *Mullane* that, where the names and post office addresses of affected parties are "at hand," notice by mail is required, the court was not referring to any and all parties who may be unearthed through investigation. *Id.* at 318–19, 70 S.Ct. 652. Rather the court referenced those parties whose identities, as in that case, were "on [the] books" of the petitioning party himself and thus gave him ready actual knowledge of the parties' in interest identities and whereabouts. *Id.* at 318, 70 S.Ct. 652.

Importantly, of course, I repeat the statutory mandate that any attack on the Torrens decree under Colorado law must be initiated within 90 days of entry of the decree. All other remedies are damages remedies. Hence, even if the Torrens decree here is in some way defective, the claimants' only remedy is money damages, and not rights to the property.

## VII. Application

Jack Taylor, and the title examiner appointed to examine the interests of competing parties in the 1960 Torrens action, exercised due diligence to identify and notify all reasonably ascertainable parties of the Torrens proceedings. Following standard Colorado procedures, they examined the title to the estate, tracing the record of title through the real estate records of the clerk and recorder's office and inspecting the land for unidentified occupants. In addition, the examiner made requests of two parties claiming to represent further unidentified individuals with interests. Finally, Taylor fenced in the property to give actual notice to any parties attempting to use the property, and published notice in the county newspaper for six weeks. These methods exceeded the necessary procedures and served to support the entry of a valid Torrens decree. Subsequent purchasers were entitled to rely upon the certificate of registration to protect their acquisition of the estates. Alternatively, any errors justifying relief must, according to statute, be brought as actions for damages, as title to the land indisputably rests in the hands of those in whom title was quieted by the Torrens decree or purchasers who relied upon that decree.

## VIII. Costs

I find no basis for assessment of prospective costs against Taylor under C.R.C.P.

---

2. I do not find *Jacobucci v. Dist. Court,* 189 Colo. 380, 541 P.2d 667 (1975) instructive on this issue. In *Jacobucci,* this court ruled as a matter of law that readily ascertainable possessors of water rights could not collectively be served notice through a mutual ditch company, which itself had no actual ownership rights in or rights to use the water.

54(d). "Costs" under the Rule reflect expenditures already made by a prevailing party, not expenditures occasioned by a remand order. The discretion to award future costs is committed to the trial court. Taylor and his successors in interest have made every effort to follow statutory and court-ordered procedures, presumably at great expense. Now to be ordered to pay costs of serving unidentified and uncounted claimants operates as an unwarranted sanction. Lastly, it is the plaintiffs who seek to quiet title as against a registered Torrens decree. Irrespective of the legal merit of their claims, they continue to bear the burden of going forward should they so choose. Taylor is the defendant here.

## IX. Conclusion

This case has had a tortuous history, of almost Dickensian proportion. Yet, despite the convoluted procedural background, clear rules of law apply and those clear rules operate to preclude these claimants from asserting any interest in the Taylor Ranch property. Counterbalanced against those clear rules of law are individuals who represent part of the history and heart of Colorado. However, acceding to their claims is truly a departure from settled principles of property law, finality of judgment, and certainty of title. I respectfully dissent, and would affirm the trial court's rulings regarding the sufficiency of notice and operation of res judicata.

I am authorized to state that JUSTICE RICE joins in this dissent.